IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SARA A.,[1]

        Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

        Defendant.

Case No. 6:19-cv-01015-JR

OPINION AND ORDER

RUSSO, Magistrate Judge:

Plaintiff Sara A. brings this action for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Title XVI Social Security Income and Title II Disability Insurance Benefits under the Social Security Act. All parties have consented to allow a Magistrate Judge enter final orders and judgement in this case in accordance with Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c). For the reasons set forth below, the Commissioner's decision is reversed, and this case is remanded for further proceedings.

---

[1] In the interest of privacy, this opinion uses only the first name and initial of the last name of the non-governmental party or parties in this case. Where applicable, this opinion uses the same designation for a non-governmental party's immediate family member.

Page 1 – OPINION AND ORDER

## PROCEDURAL BACKGROUND

Born in December 1977, plaintiff alleges disability beginning on January 1, 2016, due to poor vision, knee pain, migraines, bipolar disorder, depression, and anxiety.[2] Tr. 44-45, 117-19, 131. Her applications were denied initially and upon reconsideration. Tr. 119-42, 145-84. On June 14, 2018, a hearing was held before an Administrative Law Judge ("ALJ"), wherein plaintiff testified, as did a vocational expert ("VE"). Tr. 38-113. On August 8, 2018, the ALJ issued a decision finding plaintiff not disabled. Tr. 10-25. After the Appeals Council denied her request for review, plaintiff filed a complaint in this Court. Tr. 1-9.

## THE ALJ'S FINDINGS

At step one of the five step sequential evaluation process, the ALJ found plaintiff had not engaged in substantial gainful activity since the amended alleged onset date. Tr. 12. At step two, the ALJ determined the following impairments were medically determinable and severe: "left eye blindness; right eye glaucoma; Stickler Syndrome; right knee degenerative joint disease; migraines; obesity; asthma; post-traumatic stress disorder (PTSD); bipolar disorder; attention deficit hyperactivity disorder (ADHD); dependent personality disorder; and generalized anxiety disorder." Id. At step three, the ALJ found plaintiff's impairments, either singly or in combination, did not meet or equal the requirements of a listed impairment. Tr. 13-15.

Because she did not establish presumptive disability at step three, the ALJ continued to evaluate how plaintiff's impairments affected her ability to work. The ALJ resolved that plaintiff had the residual function capacity ("RFC") to perform light exertion work except:

> She can occasionally climb ladders, ropes and scaffolds and occasionally crawl. She has no effective use of left eye vision and no effective use of depth perception. She can occasionally perform fine detail work. She can tolerate occasional exposure

---

[2] Plaintiff initially alleged disability as of April 26, 2015, but amended her onset date at the hearing to coincide with the date she stopped working. Tr. 43.

Page 2 – OPINION AND ORDER

>to bright lights, loud noise, vibration, temperature and humidity extremes and concentrated levels of dust, fumes, gases, odors, poor ventilation, etc. She can understand[,] remember and apply short, simple instructions; perform routine tasks; and make simple decisions. She cannot work in a fast paced, production type environment. She can have occasional interaction with the general public.

Tr. 15.

At step four, the ALJ determined plaintiff could not perform any past relevant work. Tr. 23. At step five, the ALJ concluded, based on the VE's testimony, that there were a significant number of jobs in the national economy that plaintiff could perform despite her impairments, such as laundry folder and bakery worker. Tr. 23-24.

## DISCUSSION

Plaintiff argues that the ALJ erred by: (1) discrediting her subjective symptom statements; (2) rejecting the medical opinions of Jenny Stegeman-Olsen, M.D., David Freed, Ph.D., and therapist Darilou Potter; (3) failing to include all of her limitations in the RFC; and (4) relying upon VE testimony that conflicted with the Dictionary of Occupational Titles and related Selected Characteristics of Occupations (collectively the "DOT").

**I.     Plaintiff's Testimony**

Plaintiff asserts the ALJ erred by discrediting her subjective symptom testimony concerning the extent and severity of her impairments. When a claimant has medically documented impairments that could reasonably be expected to produce some degree of the symptoms complained of, and the record contains no affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of . . . symptoms only by offering specific, clear and convincing reasons for doing so." Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996) (internal citation omitted). A general assertion the claimant is not credible is insufficient; the ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not

credible." Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995) (internal citation omitted).

Thus, in formulating the RFC, the ALJ is not tasked with "examining an individual's character" or propensity for truthfulness, and instead assesses whether the claimant's subjective symptom statements are consistent with the record as a whole. SSR 16-3p, available at 2016 WL 1119029. If the ALJ's finding regarding the claimant's subjective symptom testimony is "supported by substantial evidence in the record, [the court] may not engage in second-guessing." Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002) (internal citation omitted).

At the hearing, plaintiff testified that her prosthetic left eye and right-eyed glaucoma make it difficult for her to drive in normal conditions and impossible for her to drive at night. Tr. 50-52. Plaintiff stated that she has frequent migraines and uses a prescribed medication called Imitrex to forestall the severe effects. Tr. 52-53. Her migraines occur two to three times a week and completely "knock her out" for six to eight hours, even with medication. Tr. 85-86. When the Imitrex is ineffective, plaintiff resorts to the emergency room or her doctor's office to receive an injection to ease the pain. Tr. 53. Plaintiff testified further that she has Stickler Syndrome, a genetic disorder which has resulted in severe knee osteoarthritis and retinal detachments. Tr. 55-57, 62-63. In addition, plaintiff endorsed a number of mental disorders that cause nightmares, anger problems, and frequent crying. Tr. 65-68, 81-82. Plaintiff testified that, as of June 2017, she has a state-sponsored caregiver come to her home 20 hours per month to assist with her daily activities, including parenting her teenage son. Tr. 58.

After summarizing her hearing testimony, the ALJ determined that plaintiff's medically determinable impairments could reasonably be expected to produce some degree of symptoms, but her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." Tr. 16.

Specifically, the ALJ discounted plaintiff's testimony based on her daily activities, inconsistent statements, and history of conservative treatment. Tr. 17-21. An ALJ may discredit a claimant's testimony when he or she engages in activities that are "transferable to a work setting" or "contradict claims of a totally debilitating impairment," even if "those activities suggest some difficulty functioning." Molina v. Astrue, 674 F.3d 1104, 1113 (9th Cir. 2012) (citations omitted). Likewise, an ALJ may discredit a claimant's testimony due to an "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." Id. (citations and internal quotations omitted). Substantial evidence supports the ALJ's decision in the case at bar.

For instance, the record reflects that plaintiff engaged in a relatively wide slate of daily activities despite her allegedly disabling physical and mental impairments. Plaintiff reported that she cares for her special needs son by getting him ready for school in the morning, helping him with homework, taking him to the park and medical appointments, and cooking, cleaning, and doing laundry. See, e.g., Tr. 68-69, 420, 837-38. She also reported attending her own doctor and therapy appointments, as well as life skills classes, and continued to drive despite vision and knee problems. Tr. 64, 68, 837-38, 924. In terms of hobbies, the record reflects that plaintiff enjoyed reading, watching television, coloring in adult coloring books, using Facebook, and socializing multiple times per week with her fiancé or family and friends. Tr. 76-77, 80-81, 420, 1292. In 2016

and 2017, plaintiff was employed part-time sewing wedding dresses and repairing antique stuffed animals. Tr. 48-50.

Moreover, as the ALJ denoted, plaintiff repeatedly failed to follow-up on her providers' treatment recommendations. Tr. 17-18. Regarding plaintiff's knee pain, plaintiff's doctor recommended that she undergo arthroscopic chondroplasty. Tr. 1182. Plaintiff subsequently told her primary care provider that her insurance would not pay for the surgery unless she quit smoking; however, plaintiff was not interested in either stopping smoking or smoking cessation medications such as Chantix or Wellbutrin. Tr. 1276-77. Plaintiff was also referred to occupational therapy for relief of her knee pain, but there is no indication in the record before the Court that plaintiff followed-up on this treatment recommendation. Tr. 1299. Additionally, plaintiff was generally able to manage her osteoarthritis pain with Tramadol, which she used sparingly. Tr. 1288, 1301; see also Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) (symptoms that can be adequately controlled with treatment are not disabling) (internal citations omitted).

Despite endorsing weekly severe migraines at the hearing, the record includes a sole instance of plaintiff receiving a Toradol/Reglan injection to relieve her symptoms. Tr. 1071. At this visit, plaintiff explained that her migraines occur twice per month and were usually "knocked out with Imitrex." Tr. 1073. Plaintiff also reported to another provider that "Imitrex does work." Tr. 976. Plaintiff failed to follow-up on Steven Mansberger, M.D.,'s recommendation to seek out a neurologist if her symptoms continued. Tr. 1146-47.

In sum, the ALJ provided clear and convincing reasons, supported by substantial evidence, for rejecting plaintiff's subjective symptom statements. The ALJ's evaluation of the plaintiff's subject symptom testimony is affirmed.

## II. Medical Opinion Evidence

Plaintiff argues the ALJ improperly discredited the opinions of Dr. Stegeman-Olsen and Ms. Potter. Plaintiff also contends that the ALJ erred in weighing the medical opinions of the two examining mental health specialists, Dr. Freed and Robert Kruger, Psy.D.

### A. Acceptable Medical Evidence

At the time of plaintiff's application, there were three types of acceptable medical opinions in Social Security cases: those from treating, examining, and non-examining doctors. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). To reject the uncontroverted opinion of a treating or examining doctor, the ALJ must present clear and convincing reasons supported by substantial evidence. Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) (citation omitted). If a treating or examining doctor's opinion is contradicted by another doctor's opinion, it may be rejected by specific and legitimate reasons supported by substantial evidence. Id.

#### i. Dr. Stegeman-Olsen

Plaintiff initiated care with Dr. Stegeman-Olsen in May 2017. Tr. 1256. Dr. Stegeman-Olsen treated plaintiff for respiratory and dermatological issues, as well as for osteoarthritis pain. Tr. 1256-63, 1267-80, 1285-89, 1292-95, 1299-302, 1305-08.

In May 2018, Dr. Stegeman-Olsen completed a medical source statement that included an assessment of plaintiff's "Work Related Mental Activities." Tr. 1371-77. In the statement, Dr. Stegeman-Olsen noted that plaintiff's "symptoms do tend to wax and wane as far as anxiety and panic attacks," and "[her] coping skills are impaired though she has had improvement with medication management and therapy." Tr. 1374. The doctor opined that the combination of plaintiff's mental and physical issues would make it difficult to for her to sustain a full-time

occupation. Tr. 1375. On the accompanying check-box form, Dr. Stegeman-Olsen endorsed the following impairments:

> • moderate limitations in plaintiff's ability to remember locations and work-like procedures, make simple work-related decisions, interact appropriately with the general public, ask simple questions or request assistance, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness;
>
> • moderate-severe limitations in plaintiff's ability to understand and remember very short, simple instructions or detailed instructions, carry out very short and simple instructions or detailed instructions, maintain attention and concentration for extended periods of time, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting, and be aware of normal hazards and take appropriate precautions; and
>
> • severe limitations in plaintiff's ability to work in coordination with or proximity to others without being distracted by them, complete a normal work day or work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, travel in unfamiliar places or use public transportation, set realistic goals or make plans independent of others, and perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.

Tr. 1376-77.

The ALJ assigned little weight to Dr. Stegeman-Olsen's medical opinion because she was not plaintiff's mental health care provider and the treatment notes of nurse practitioner Nathaniel Holt, who worked at the same clinic as Dr. Stegman-Olsen and was responsible for managing plaintiff's psychological symptoms, were inconsistent with the severe limitations articulated in her statement. Tr. 22-23.

Initially, an independent review of the record confirms that Dr. Stegeman-Olsen did not treat plaintiff for her mental health issues; instead, the ALJ is correct that Mr. Holt was responsible for mental health counseling and medication management during this time period. Tr. 960-63, 971-73, 977-82, 991-1002, 1253-55, 1264-66, 1280-82, 1289-91, 1302-04. Contrary to plaintiff's assertion, it was appropriate for the ALJ to consider the nature and extent of her treating

relationship with Dr. Stegeman-Olsen, as well as each providers' area of respective expertise. 20 C.F.R. §§ 404.1527(c), 416.927(c). The fact that Dr. Stegeman-Olsen had access to Mr. Holt's records, and inquired on one occasion regarding plaintiff's mental health medications, does not transform Dr. Stegeman-Olsen into a treating mental health provider. Pl.'s Opening Br. 10 (doc. 15). Indeed, Dr. Stegeman-Olsen's chart notes make clear that she was providing care to plaintiff solely in regard to physical impairments. Tr. 1256-63, 1267-80, 1285-89, 1292-95, 1299-302, 1305-08.

Furthermore, Mr. Holt's treatment notes do not provide a basis for Dr. Stegeman-Olsen's opinion. These chart notes indicate that plaintiff's mental health issues were exacerbated by situational stressors but otherwise mitigated with proper medication. On January 26, 2016, plaintiff had her initial appointment with Mr. Holt, in which she described her past mental health issues. Tr. 960-63. At the time, plaintiff stated that, "she feels as stable as she has been in recent memory." Tr. 963.

In fact, by January 2017, plaintiff described her mood as "euthymic without depression, irritability, or depression." Tr. 1001. In April 2017, plaintiff reported worsening feelings of depression over the past 10 days. Tr. 1253. Yet by July 2017, plaintiff's symptoms were improving after she ended her relationship with her fiancé because of his struggles with alcohol abuse. Tr. 1265. Although plaintiff's mental health symptoms continued to wax and wane in this manner, the Court notes that periods of worsening depression tended to coincide with high-stress periods, such as in March 2018 when plaintiff's son was accused of a crime and faced the possibility of incarceration. See, e.g., Tr. 1282, 1291, 1304.

Page 9 – OPINION AND ORDER

Nevertheless, despite the waxing and waning of symptoms, Mr. Holt never qualified plaintiff's degree of incapacity as anything greater than moderate.[3] Tr. 971, 977, 991, 996, 1000, 1264, 1289, 1302. Similarly, on numerous occasions, plaintiff self-described her problems as moderate. Tr. 991, 996, 1000, 1264, 1289. Although not dispositive, the Court also notes that Dr. Stegman-Olsen's opinion is inconsistent with the two examining mental health specialist opinions that appear in the record. As such, the ALJ did not err in evaluating Dr. Stegeman-Olsen's opinion. While plaintiff offers a more favorable interpretation of this evidence, the ALJ's reading was nonetheless rational such that it must be upheld. Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1198 (9th Cir. 2004).

### ii. Dr. Freed

The record before the Court contains two consultative examinations from acceptable medical sources: Dr. Kruger and Dr. Freed. In April 2016, Dr. Kruger completed a psycho-diagnostic interview with plaintiff. Tr. 836. In his subsequent report, Dr. Kruger opined that plaintiff would have no difficulty understanding instructions for simple, routine, repetitive tasks and would be able to persist on those tasks adequately and independently. Tr. 840. The ALJ assigned significant weight to Dr. Kruger's opinion and based the RFC's mental limitations largely thereon. Tr. 15, 21.

In May 2017, Dr. Freed conducted a psychological evaluation of plaintiff that included a review of her medical records, a clinical interview, and objective testing. Tr. 1166. Based on this

---

[3] Although plaintiff did experience a period of auditory and visual hallucinations in October 2016, it was determined that they were not a result of mania, but likely the side effect of a new bipolar medication, Depakote. Tr. 991-92. Despite the hallucinations, Mr. Holt noted that plaintiff did not present as manic or psychotic, but instead was calm and cooperative. Id. After tapering off the medication, Mr. Holt observed that plaintiff "appeared to be stabilizing." Tr. 998. Plaintiff self-reported good medication compliance and improving therapeutic benefit thereafter.

evaluation, Dr. Freed diagnosed plaintiff with bipolar disorder, generalized anxiety disorder, PTSD, panic disorder, agoraphobia, and a minor neurological disorder. Tr. 1172.

Due to these impairments, Dr. Freed opined that plaintiff would have difficulty maintaining a daily work routine and interacting appropriately with co-workers or supervisors. Tr. 1175. He also stated that plaintiff would struggle to learn and remember work procedures and policies. Id. Moreover, Dr. Freed expressly reviewed and discounted Dr. Kruger's opinion because: (1) it disregarded clear diagnostic information provided by plaintiff's mental health providers; and (2) Dr. Kruger did not account for plaintiff's history of being victimized by domestic violence. Id.

In the corresponding "Functional Assessment Form," Dr. Freed opined that plaintiff would be:

- moderately impaired in her ability to distinguish between acceptable and unacceptable work performance, set realistic goals, maintain personal hygiene and attire to a work setting, understand and learn terms, instructions, and procedures, follow two step instructions to carry out a task, and describe work activity to someone else; and

- moderately severely impaired in her ability to adapt to changes, manage psychologically based symptoms, manage plans for herself independently of others, be aware of normal hazards and take appropriate precautions, respond to requests, suggestions, criticism, correction, and challenges, and keep social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness.[4]

Tr. 1176-77.

The ALJ assigned little weight to Dr. Freed's opinion because his conclusions were inconsistent with his exam findings – i.e., the fact that plaintiff "was casually dressed with appropriate grooming," "was cooperative and motivated during testing," had "generally fluent and well articulated" speech, and performed within the average range on IQ testing and the mini mental status exam. Tr. 22. The ALJ also found that Dr. Freed's opinion was inconsistent with plaintiff's

---

[4] Dr. Freed's Functional Assessment Form appears to be missing at least one page.

Page 11 – OPINION AND ORDER

ability to interact appropriately with treating providers and the fact that she had been diagnosed with bipolar disorder since 2008 but worked at substantial gainful levels thereafter. Id.

While contradiction between a doctor's opinion and treatment notes can constitute a legally sufficient reason, here substantial evidence does not support the ALJ's conclusion. In fact, the ALJ overlooked many salient aspects of Dr. Freed's report that were indicative of mental impairment. This is especially problematic given that the superficial indices of normal functioning relied on by the ALJ have no bearing on the specific symptoms that plaintiff alleges are disabling, nor on the valid clinical tests that formed the basis of Dr. Freed's opinion. See Reddick v. Chater, 157 F.3d 715, 722-23 (9th Cir. 1998) (ALJ's "paraphrasing of record material" was "not entirely accurate regarding the content and tone of the record" and therefore did not constitute substantial evidence).

Notably, Dr. Freed observed plaintiff to be "extremely anxious during interview and testing," such that "testing was abbreviated somewhat." Tr. 1170. Accordingly, she was noted to be "cooperative and motivated during testing" but only within "the apparent limits of her ability level." Id.; see also Tr. 1171 (Dr. Freed denoting there was no indication of symptom exaggeration or malingering). Significantly, objective testing metrics reflected mildly impaired memory, severe depression, and recurrent hypomanic episodes. Tr. 1171.

Concerning the ALJ's second rationale, the fact that plaintiff was able interact appropriately with medical providers does not undermine Dr. Freed's report. As addressed herein, plaintiff sought frequent treatment for her mental impairments and is not alleging disability due to significant social dysfunction. To uphold this reasoning under the circumstances would essentially punish plaintiff for attempting to alleviate her symptoms through medication management and counseling, which the Court declines to do.

Contrary to the ALJ's third rationale, there is some indication in the record that plaintiff's mental impairments have worsened over time. As addressed in great detail below, the discrepancy between Dr. Kruger's assessment, which took place approximately two months after the alleged onset date, and Dr. Freed's assessment, which occurred one month prior to plaintiff obtaining state-sponsored in-home assistive services, is suggestive of a decline in functioning, as is plaintiff's work history and the chart notes of Ms. Potter. Regardless, the fact that plaintiff was diagnosed with an impairment eight years before the alleged onset date does not reflect adversely on the overall validity of Dr. Freed's objective findings from 2017. Finally, the Court notes that the ALJ wholly overlooked Dr. Freed's critique of Dr. Kruger's earlier evaluation.

The ALJ therefore committed harmful error in weighing the consultative psychological assessments. See Stout v. Comm'r of Soc. Sec. Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (only mistakes that are "nonprejudicial to the claimant or irrelevant to the ALJ's ultimate disability conclusion" are harmless).

### B.  Non-Acceptable Medical Evidence

While only "acceptable medical sources" can diagnose and establish that a medical impairment exists, evidence from "other medical sources," including therapists, can be used to determine the severity of the impairment and how it affects the claimant's ability to work. SSR 06-03p, available at 2006 WL2329939. To reject the opinion of an "other medical source," the ALJ must provide a germane reason supported by substantial evidence. Lewis v. Apfel, 236 F.3d 503, 512 (9th Cir. 2001).

In March 2012, plaintiff initiated mental health therapy with Ms. Potter. Tr. 1164. The record includes Ms. Potter's treatment notes from January 2014 through April 2018. Tr. 576-682,

898-948, 1329-70. Plaintiff sought approximately bi-weekly counseling with Ms. Potter, which was in addition to her medication management appointments with Mr. Holt.

In April 2017, Ms. Potter wrote a letter summarizing plaintiff's mental health symptoms – namely, that plaintiff experiences difficulties with anxiety, panic attacks, lack of sleep, mood dysregulation, irritability, and anger issues. Tr. 1378. Ms. Potter explained that plaintiff suffers from cycles of mania and lack of sleep that result in uncontrollable anger. Tr. 1379. Although plaintiff attempts to use relaxation techniques learned in therapy, Ms. Potter indicated that plaintiff's anger is directed indiscriminately towards others. Id.

In May 2017, Ms. Potter provided a second letter in which she stated:

> [Plaintiff] functions at a high level within a prescribed setting, such as at home or my office. The unknown, as well as changes in the routine, easily overwhelm her due to her vision limitations, her high anxiety and panic attacks and suspicion of what is required of her. Her ability to adapt to change is limited by these things. She has difficulties managing some of her psychological symptoms . . .
>
> [Plaintiff] is able to understand and apply new instructions and procedures, but, due to mood dysregulation, suspicion, anxiety and/or lack of sleep she is not able to sustain what she is required to do for a position. She would/can do well for several weeks or even months, but then she might experience difficulty in her perception of how well she is doing or what another person has said to her or expectations may change and then she would no longer be able to do the work or sustain the relationship . . . She may begin a job fully intending to complete the work, but, then as she begins to doubt how well she is doing, or anxiety begins to creep in, she may stop what she is doing. Then, she might become angry, blame another person for not supporting or understanding her, or begin to doubt herself. If the pace is set at a faster speed than she feels she can maintain she will stop working and become irritable and angry . . . [Plaintiff] wants to work, but is held by back by the symptoms she experiences.

Tr. 1164-65.

The ALJ assigned little weight to Ms. Potter's opinion. Tr. 21-22. The ALJ concluded that Ms. Potter's first letter did not assess plaintiff's work-related abilities and was instead merely a recitation of plaintiff's subjective symptom statements. Tr. 21. The ALJ determined that Ms.

Page 14 – OPINION AND ORDER

Potter's second letter was inconsistent with plaintiff's ability to work at substantial gainful levels until January 2016, as well as the moderate global assessment of functioning ("GAF") scores assessed in February 2016 and February 2017, and signs of improvement demarcated in February 2018. Tr. 22.

The ALJ erred as to Ms. Potter's opinion. Ms. Potter's first letter specifically described psychological symptoms that would interfere with plaintiff's ability to work, such that it constituted relevant and probative evidence that the ALJ was required to meaningfully discuss. Tr. 1378-79; see also Buck v. Berryhill, 869 F.3d 1040, 1049 (9th Cir. 2017) (psychiatric evaluations "will always depend in part on the patient's self-report, as well as the clinician's observations of the patient," such that it is impermissible to reject mental health opinion evidence on this basis).

As to Ms. Potter's second letter, the fact that plaintiff worked at substantial gainful levels prior to the period in which Ms. Potter opined that plaintiff would have significant work-related limitations of function is immaterial. "[C]laimants should not be penalized for attempting to lead normal lives in the face of their limitations," especially prior to the alleged onset date of disability. Reddick, 157 F.3d at 722.

Further, "GAF scores, standing alone, do not control determinations of whether a person's mental impairments rise to the level of a disability (or interact with physical impairments to create a disability)," in part because they "are typically assessed in controlled, clinical settings that may differ from work environments in important respects." Garrison v. Colvin, 759 F.3d 995, 1002 n.4 (9th Cir. 2014). Thus, a medical source's "narrative discussion is more probative than a GAF score in ascertaining plaintiff's functional capacity." Morrison v. Colvin, 31 F.Supp. 1225, 1232 (E.D. Wash. 2014) (internal quotations and citations omitted); see also Hughes v. Colvin, 599 Fed.Appx. 765, 766 (9th Cir. 2015) ("a GAF score is merely a rough estimate of an individual's psychological,

social, or occupational functioning used to reflect an individual's need for treatment, but it does not have any direct correlative work-related or functional limitations") (citation omitted).

In any event, the two GAF scores of 51 assessed by Ms. Potter are not contravened by her May 2017 letter, especially because they do not inhere to any specific timeframe and instead are a snapshot of functioning reflected on an annual assessment. Tr. 903, 905. A GAF score within this range suggests that plaintiff experienced moderate-to-severe psychological symptoms, which is consistent with Ms. Potter's chart notes from the relevant time period, as well as Dr. Freed's assessment. Tr. 576-682, 898-948, 1329-70; see also Garrison, 759 F.3d at 1002 n.4 ("a GAF score between 51 to 60 describes moderate symptoms," whereas "a GAF score between 41 and 50 describes serious symptoms"). Finally, the February 2018 annual review from Ms. Potter indicates that plaintiff's improvement was related to having the assistance of a care provider on certain days; as of that date, plaintiff remained both manic and anxious. Tr. 1339-40. The ALJ failed to provide a germane reason, supported by substantial evidence, for rejecting Ms. Potter's opinion.

## III. RFC and Step Five Finding

Plaintiff asserts that the ALJ's RFC and step five finding are erroneous because they do not adequately account for the limitations described in her testimony or the medical opinions of Ms. Potter and Drs. Stegeman-Olsen and Freed.[5] Additionally, plaintiff argues that the ALJ failed to resolve a conflict between the VE's testimony and the DOT.

This argument is partially well-taken. As specified above, the ALJ wrongfully discounted the opinions of Ms. Potter and Dr. Freed. Because the ALJ failed to account for the work-related

---

[5] Plaintiff also argues that the RFC is deficient because the ALJ failed to include restrictions related to her need for a cane and disabled parking permit. Pl.'s Opening Br. 26-27 (doc. 15). Yet these issues appear as part of the larger medical record and plaintiff did not indicate the need for restrictions associated with either at the hearing, despite being afforded an opportunity to do so. Tr. 37-113.

Page 16 – OPINION AND ORDER

limitations of function described by these sources in plaintiff's RFC, the ALJ erred in relying upon the VE's testimony at step five. See Matthews v. Shalala, 10 F.3d 678, 681 (9th Cir. 1993) (if a VE's "hypothetical does not reflect all the claimant's limitations, then the . . . testimony has no evidentiary value") (citations and internal quotations omitted). As a result, the ALJ's ultimate decision is not supported by substantial evidence and remand is necessary.

**IV.    Remedy**

The decision whether to remand for further proceedings or for the immediate payment of benefits lies within the discretion of the court. Harman v. Apfel, 211 F.3d 1172, 1176-78 (9th Cir. 2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1090-1100 (9th Cir. 2014). The court may not award benefits punitively and must conduct a "credit-as-true" analysis on evidence that has been improperly rejected by the ALJ to determine if a claimant is disabled. Strauss v. Comm'r of Soc. Sec. Admin., 635 F.3d 1135, 1138 (9th Cir. 2011); see also Dominguez v. Colvin, 808 F.3d 403, 407-08 (9th Cir. 2015) (summarizing the standard for determining the proper remedy).

As discussed herein, the ALJ committed harmful legal error by failing to properly weigh the opinions of Ms. Potter and Dr. Freed. The record is nonetheless ambiguous regarding the extent of plaintiff's allegedly disabling impairments. On one hand, plaintiff engaged in activities during the adjudication period that were in excess of her subjective symptom testimony. On the other hand, plaintiff sought regular treatment for her mental health issues and took her medication as

prescribed. Further, there is evidence in the record that plaintiff's mental health symptoms wax and wane, but may have overall worsened during the adjudication period.

For example, Dr. Kruger, who examined plaintiff towards the beginning of the adjudication period, found few mental limitations based on plaintiff's overall level of functioning at the time, including fairly robust daily activities. However, as discussed above, Mr. Holt's chart notes reflect the persistent nature of plaintiff's mental impairments, despite regular treatment and medication management, and Ms. Potter's chart notes suggest an inability to work on a sustained basis. Based in part on this more recent evidence, Dr. Freed discounted Dr. Kruger's assessment and found that plaintiff was more significantly impaired. As such, it is unclear from the record if, or when, plaintiff became disabled.

Accordingly, further proceedings are required to resolve this case. See Treichler, 775 F.3d at 1099 (except in "rare circumstances," the proper remedy upon a finding of harmful error is to remand for further administrative proceedings). Given the nature of plaintiff's impairments and remote date last insured, use of a medical expert would be helpful in defining the extent and timeframe of plaintiff's mental impairments. Therefore, upon remand, the ALJ must consult a medical expert and, if necessary, reformulate plaintiff's RFC and obtain additional VE testimony.

## CONCLUSION

For the reasons stated above, the Commissioner's decision is REVERSED, and this case is REMANDED for further proceedings.

IT IS SO ORDERED.

DATED this 22nd day of April, 2020.

/s/ Jolie A. Russo
Jolie A. Russo
United States Magistrate Judge